***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission affirms with minor modifications the Opinion and Award of the Deputy Commissioner.
 *********** ORDER
By agreement of the parties, the Full Commission admits into evidence a videotape detailing plaintiff's job duties.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are subject to the North Carolina Workers' Compensation Act.
2. At all relevant times hereto, an employee/employer relationship existed between the named employee and named employer.
3. Plaintiff's average weekly wage on 13 July 2000 was $449.02, which yields a compensation rate of $299.35.
4. Plaintiff's average weekly wage on 9 October 2002 was $356.78, which yields a compensation rate of $237.78.
5. Plaintiff sustained an injury to his left shoulder on or about 13 July 2000.
6. The 13 July 2000 injury arose out of and in the course of plaintiff's employment and is compensable.
7. The carriers liable on the risk are: Safeco for the 13 July 2000 injury and Kemper for the 9 October 2002 alleged injury.
8. The following materials were admitted into evidence: (a) an indexed set of medical records; (b) an Employment Security Commission document; (c) an application for employment; and (d) a patient history itemizing medical expenses incurred with Eckerd Drugs.
 ***********
Based on the foregoing stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the date of hearing before the deputy commissioner, plaintiff was forty-eight years old with a high school diploma and an associate's degree from a community college. Plaintiff began working for defendant-employer, a manufacturer of shopping carts, metal dollies and like merchandise, in March 1998 as a material handler. As a material handler, plaintiff used a forklift and tow truck to transport shopping carts and other similar manufactured goods. The material handler job required plaintiff to be able to lift up to 70 pounds. Plaintiff testified that he repeatedly lifted at least 10 pounds 70% of the time he was working.
2. On 13 July 2000, plaintiff sustained an injury by accident when his feet slipped off the rung of a ladder and for a time he hung by his left arm some 15 to 20 feet in the air. Plaintiff eventually regained his footing. As a result of this accident, he experienced pain in his left shoulder. On 1 August 2000, plaintiff sought treatment from Dr. John dePerczel. On that date, plaintiff reported that he had injured his left shoulder two weeks previously when he was hanging by his left arm and immediately felt severe left shoulder pain. An examination revealed pain and weakness in plaintiff's left arm, consistent with a strain or tear of the left rotator cuff. Dr. dePerczel injected plaintiff's shoulder and recommended exercises. Plaintiff's condition did not improve after more than 4 months of treatment. Dr. dePerczel recommended arthroscopic surgery as a treatment option on 6 April 2001. He was of the opinion that plaintiff had a left rotator cuff tear. Dr. dePerczel performed left shoulder surgery to repair the torn left rotator cuff on 10 September 2001. Defendants accepted plaintiff's injury as compensable.
3. Prior to surgery, plaintiff continued to work in his job as a material handler. He wore a sling on his left arm and performed all of his work with his right arm. Approximately 3 months after his 13 July 2000 injury, plaintiff began to develop pain in his right arm due to overuse.
4. After his 10 September 2001 surgery, plaintiff was taken out of work and he underwent therapy. On 10 January 2002, Dr. dePerczel was of the opinion that plaintiff could try returning to his regular job for 4 hours per day as no light duty was available.
5. On 15 January 2002 and 24 January 2002, Dr. dePerczel limited plaintiff's lifting to 10 pounds and continued his restrictions of working no more than 4 hours per day for the next month. Plaintiff's physical therapy and various medications were continued.
6. Plaintiff continued to progress and on 27 March 2002, Dr. dePerczel increased his working hours to 6 hours per day and restricted him from performing overhead work. At that time, plaintiff reported that his job had been eliminated and he had been assigned to jobs which involved picking up scrap materials and painting racks. Dr. dePerczel was concerned about plaintiff's ability to do overhead painting.
7. On 30 April 2002, Dr. dePerczel increased plaintiff's work to 8 hours per day with restrictions of no lifting over 25 pounds and no overhead work with the left arm. Plaintiff was prescribed Oxycontin instead of Demerol; his Zanaflex was increased to 4 mg and physical therapy was continued.
8. On 6 June 2002, plaintiff reported to Dr. dePerczel that he was working on an assembly line and the repetitive work was aggravating his shoulder. Dr. dePerczel decided to wean him off Oxycontin. He prescribed a Lidoderm patch, Elavil, Bextra and a TENS unit. Dr. dePerczel limited plaintiff's assembly line work to 45 minutes per hour and no more than 4 hours per day.
9. On 9 July 2002, Dr. dePerczel restricted plaintiff to 10-minute breaks every hour if he was performing repetitive work. Otherwise, plaintiff could continue to work 8 hours per day with lifting restrictions of no more than 25 pounds. Physical therapy was continued.
10. On 12 August 2002, Dr. dePerczel found plaintiff at maximum medical improvement, gave him permanent restrictions of no lifting over 25 pounds, assigned him a permanent partial disability rating of 15%, discontinued physical therapy and approved a job description for plaintiff for a material handler position as long as plaintiff's lifting was restricted to 25 pounds.
11. As a result of his 13 July 2000 injury by accident and resulting surgery, plaintiff was unable to work in any employment from 10 September 2001 through 15 January 2002 and partially disabled from 15 January 2002 through 30 April 2002. Plaintiff returned to working 8 hours per day with restrictions on 1 May 2002.
12. On 4 October 2002, plaintiff sought a second opinion with Dr. Jerry L. Barron with regard to an evaluation of his bilateral shoulder pain. He reported to Dr. Barron that he had begun to experience right shoulder pain as a result of doing one handed light duty work for the defendant-employer several months after his 13 July 2000 injury by accident. Dr. Barron recommended that the plaintiff undergo an MRI of both shoulders.
13. On 9 October 2002, plaintiff was performing a light duty job assignment for the defendant-employer when his right arm was jerked and pulled as a result of the dolly he was holding on to being suddenly moved by a tow motor. On 11 October 2002, plaintiff reported to his supervisor, Denny Miller, that he was experiencing right shoulder pain. Based upon plaintiff's description as to how the pain in his right arm had developed, his supervisor informed him that he could not record an injury because no specific incident had occurred. Plaintiff then reported to him that he had experienced a sharp pain following a jerking incident on 9 October 2002. Plaintiff testified that he did not immediately seek medical attention because he did not want to place his job in jeopardy.
14. On direct examination, plaintiff testified that the pain in his right shoulder after 9 October 2002 was a sharper pain than the dull ache he felt prior to the 9 October 2002 incident. He further testified that the subsequent pain was accompanied by a burning sensation and weakness that he had not experienced prior to 9 October 2002. However, on cross-examination, plaintiff testified that the pain in his right shoulder was "about the same" presently and before the 9 October 2002 incident. Plaintiff was able to continue to work following the 9 October 2002 incident. A subsequent MRI of his left shoulder revealed a healed rotator cuff repair and some cartilage irregularity. The MRI of plaintiff's right shoulder revealed a partial thickness tear of supraspinatus rotator cuff and a right SLAP lesion.
15. Plaintiff filed a Form 18 on 24 January 2003.
16. On 28 January 2003, Dr. Barron recommended surgery on both shoulders consisting of: (a) a repeat arthroscopy with revision acromioplasty, an AC resection and debridement of cartilage of the left shoulder; and (b) an arthroscopy, rotator cuff repair, AC joint resection and debridement of the right shoulder.
17. Dr. Barron was of the opinion that due to plaintiff's overuse and repetitive work with his right shoulder because of the injury to his left shoulder, plaintiff was at an increased risk of developing a rotator cuff tear or cartilage tear in the right shoulder. He also opined that the overuse of plaintiff's right shoulder caused his right shoulder partial rotator cuff tear.
18. Dr. Barron also opined that plaintiff's 9 October 2002 injury contributed to the problems plaintiff suffered with his right shoulder. Dr. Barron was unable to state exactly when plaintiff's right SLAP lesion occurred.
19. Dr. dePerczel opined that plaintiff's 13 July 2000 injury was a significant causative factor in plaintiff's left shoulder condition and that overuse of plaintiff's right arm because of his left arm limitations could have aggravated an underlying rotator cuff problem in his right shoulder. Dr. dePerczel also was of the opinion that plaintiff's 9 October 2002 injury "certainly" could have caused or aggravated plaintiff's right shoulder rotator cuff injury. When asked which of the two injuries to plaintiff's right shoulder more likely caused the right shoulder problems, Dr. dePerczel replied that he did not know.
20. On 4 August 2003, plaintiff told the rehabilitation nurse, Shelly Stowe, that he did not want to attend the second opinion appointment with Dr. David DuPuy in Charlotte because he was concerned about driving and being able to find Dr. DuPuy's office while under pain and depression medications.
21. After working for defendant-employer as a painter, plaintiff returned to his position as a material handler until 7 August 2003, when he was notified by Denny Miller, human resources manager, and Dale Patton, the manufacturing manager, that defendant-employer no longer had available light-duty work that would comply with plaintiff's restrictions. Defendant-employer placed plaintiff on family medical leave and has kept his job open until plaintiff is able to return to work with no restrictions. Plaintiff filed for unemployment benefits, but his application was denied because he had been placed on family medical leave.
22. Defendants sent plaintiff to Dr. DuPuy on 21 August 2003. Dr. DuPuy recommended a partial rotator cuff repair for the right shoulder, but stated that surgical intervention for plaintiff's left shoulder would have less than a 50% chance of helping his symptoms, let alone alleviating them. Dr. DuPuy agreed with Dr. Barron's 15% permanent partial disability impairment rating to plaintiff's left shoulder.
23. Dr. dePerczel performed a second arthroscopic surgery on plaintiff's left shoulder on 8 October 2003. Plaintiff's rotator cuff tendons were intact; there was no recurrent tear, though he had some inflammation on the outside of his rotator cuff. Decompression was performed to try to give the rotator cuff tendon more room to improve his function and lessen his pain. Dr. dePerczel testified that he decided to perform the second surgery on plaintiff's left shoulder because of Dr. Barron's recommendation, plaintiff's persistent pain and the MRI findings.
24. After plaintiff's 8 October 2003 surgery, defendant-employer and Safeco resumed paying temporary total disability benefits.
25. Arthroscopic surgery on plaintiff's right shoulder is reasonably necessary to assist plaintiff in relieving his pain, lessen his disability and/or effect a cure for his right shoulder condition. Arthroscopic surgery on plaintiff's left shoulder was reasonably necessary to assist plaintiff in relieving his pain, lessen his disability and/or effect a cure for his left shoulder condition.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On 13 July 2000, plaintiff sustained an admittedly compensable injury to his left shoulder. Safeco was the carrier responsible for this injury. As a direct result of the 13 July 2000 compensable injury by accident, plaintiff overused his right shoulder and sustained a compensable occupational disease, and a right shoulder rotator cuff tear, which was proven to be a cause and condition characteristic of and peculiar to his employment with the defendant-employer, and not an ordinary disease of life to which the general public is equally exposed to outside of his employment. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff also sustained an injury by accident to his right shoulder arising out of and in the course of his employment on 9 October 2002, which contributed to his right shoulder problem. Kemper was the carrier on risk on 9 October 2002. There is insufficient evidence from which to find that plaintiff's 9 October 2002 injury caused plaintiff an increase in disability.
3. Plaintiff is entitled to have the defendant-carrier Safeco Insurance provide all medical treatment for plaintiff's right partial rotator cuff tear, including arthroscopic surgery, for so long as such treatment may be reasonably required to effect a cure, provide relief, or lessen the period of disability. N.C. Gen. Stat. § 97-25.
4. Plaintiff is entitled to have the defendant-carrier Safeco Insurance provide all medical treatment for plaintiff's left shoulder, including arthroscopic surgery on 8 October 2003, for so long as such treatment may be reasonably required to effect a cure, provide relief, or lessen the period of disability. N.C. Gen. Stat. § 97-25.
5. Plaintiff is entitled to additional temporary total disability benefits from 7 August 2003 and continuing in the amount of $299.35 per week. N.C. Gen. Stat. § 97-29.
6. Dr. Barron should be approved as plaintiff's treating physician.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendant-carrier Safeco Insurance shall continue to pay plaintiff temporary total disability compensation at the rate of $299.35, per week beginning 7 August 2003 and continuing until further order of the Commission. Defendant Safeco is entitled to a credit for all compensation, if any, paid to plaintiff since reinstating benefits on 8 October 2003. All accrued compensation shall be paid in a lump sum.
2. Defendant-carrier Safeco Insurance shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of his compensable shoulder injuries so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability.
3. A reasonable attorney's fee of 25% of the compensation due plaintiff prior to deduction for defendants' credit is hereby approved for plaintiff's counsel and shall be deducted and paid by defendants directly to plaintiff's counsel. Thereafter, defendants shall forward each fourth check directly to plaintiff's counsel.
4. Dr. Barron is authorized as plaintiff's treating physician.
5. Defendant Safeco shall pay the costs.
This the ___ day of January 2005.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ DIANNE C. SELLERS COMMISSIONER